# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

NATALIE J. SKAKLE,
    *Plaintiff*,

*v.*                     CASE NO. 14-cv-10116

COMMISSIONER OF          DISTRICT JUDGE STEPHEN J. MURPHY
SOCIAL SECURITY,         MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

This Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment (docket 10) be granted, that Defendant's Motion for Summary Judgment (doc. 11) be denied, and the decision of the Commissioner be reversed and remanded for further action as set forth herein.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for supplemental security income benefits (SSI). The matter is currently before this Court on cross-motions for summary judgment.[2] (Docs. 10, 11, 12.)

---

[1]The format and style of this Report and Recommendation comply with the requirements of Fed. R. Civ. P. 5.2(c)(2)(B). This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

[2]The Court has reviewed the pleadings and dispenses with a hearing pursuant to Eastern District of Michigan Local Rule 7.1(f)(2).

Plaintiff filed an application for SSI on January 22, 2011, alleging that she became unable to work on March 27, 2009. (Transcript, Doc. 6 at 86, 134-41.) Plaintiff's claims were denied at the initial administrative stages. (Tr. 74-90.) On March 16, 2012, Plaintiff appeared at a video hearing before Administrative Law Judge ("ALJ") James N. Gramenos, who considered the application for benefits *de novo*. (Tr. 25, 33.) In a decision dated July 2, 2012, the ALJ found that Plaintiff was not under a disability within the meaning of the Social Security Act at any time from January 22, 2011, the date of application, through the date of the ALJ's decision. (Tr. 25.) Plaintiff requested Appeals Council review of this decision. (Tr. 8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on November 15, 2013, when the Appeals Council denied Plaintiff's request for review. (Tr. 1-5.) On January 13, 2014, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

### B.   Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions.  Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is "more than a scintilla . . . but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(quoting *Cutlip v. Sec'y Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consolidated Edison Co. v. NLRB*, 305 F.3d 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not

the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports another conclusion. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994)(citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)(en banc)(citations omitted)).

"Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party")(citations omitted); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. Appx. 521, 526 (6th Cir. 2006).

## C.    Governing Law

Disability for purposes of SSI is defined as being:

[U]nable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.

42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 416.905(a)(SSI). Plaintiff's Social Security disability determination is to be made through the application of a five-step sequential analysis:

Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. § 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a

dispositive finding at any point in the five-step process, the review terminates." *Colvin v. Barnhart,*

475 F.3d 727, 730 (6th Cir. 2007).

"Through step four, the claimant bears the burden of proving the existence and severity of

limitations caused by [his] impairments and the fact that [he] is precluded from performing [his]

past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003)(cited with

4

approval in *Cruse v. Comm'r of Soc. Sec.,* 502 F.3d 532, 540 (6th Cir. 2007)); *see also Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)("[c]laimant bears the burden of proving his entitlement to benefits."). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. § 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since January 22, 2011, the application date. (Tr. 17.) At step two, the ALJ found that Plaintiff's history of multiple sclerosis was a "severe" impairment and her optic neuritis, sleep apnea and mood disorder were non-severe within the meaning of the second sequential step. (Tr. 17, 20.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. 21.) The ALJ found that the Plaintiff had the residual functional capacity (RFC) to perform a full range of light work as defined in the Regulations[3]. (Tr. 21.)

At step four, the ALJ found that Plaintiff could perform her past relevant work as a press operator. (Tr. 25.) As an alternative finding, at step five, the ALJ found that pursuant to the

---

[3] Light work is defined as

[L]ifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C.F.R. § 416.967(b).

Medical Vocational Guidelines, Rule 202.17 of the Social Security Regulations, Plaintiff was not disabled. (Tr. 25.) *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2.

###    E.    Administrative Record

Plaintiff was 32 years old at the time of the hearing. (Tr. 34.) Plaintiff has a husband and three children; the youngest was four years old. (Tr. 34-35.) She has an eleventh grade education and is working on her GED. (Tr. 39.) Plaintiff testified that she has worked on a dairy farm, at a car parts factory, in housekeeping at a hotel and for a janitorial service at an automotive business. (Tr. 35-36.) She also testified that her last employment was at a plastic injection factory where she ran a mold or heat press. She testified that "there were several stations to that job" and she would "run the press, take the parts out, saw them off . . . then put them on another machine that painted them." (Tr. 36-37.) Upon detailed questioning from the ALJ, Plaintiff explained that she performed this job while standing, the machine she used was automatic and it used plastic pellets instead of liquid plastic. (Tr. 41-42.) She pushed buttons to start the part, used a bandsaw to cut the parts from their plastic holder, then pushed buttons to paint the part. (Tr. 42.) She placed the finished parts onto a wheeled rack that someone would then wheel away. (Tr. 43.) She testified that the heaviest weight she lifted was 15 to 20 pounds and she was terminated from that job after she was found sleeping on the job. (Tr. 37.) She explained that she later found out that she was sleeping on the job because she was having seizures. (Tr. 37.) The ALJ did not question a vocational expert at the hearing.

Plaintiff confirmed that she was seeking disability on the basis of her multiple sclerosis, anxiety and depression. (Tr. 37, 39.) She explained that she has severe fatigue, vertigo, headaches and memory problems. (37-39, 47.) She testified that heat makes her symptoms worse and she needs to rest approximately three times per day for twenty minutes each time. (Tr. 38.) Plaintiff

testified that she takes an injection of medication for her multiple sclerosis, Neurontin for leg spasms, medication for bladder spasms, and Benadryl for the reactions she has to the injections, which include lumps or welts on her skin and bruising. She testified that the injected medication also makes her feel "drunk" and gives her heart palpitations for about 20 minutes after each injection, followed by fatigue. (Tr. 40.) At the time of the hearing she had not been taking medication for her mental condition for the prior two years. (Tr. 64.)

### F.    Analysis

Plaintiff contends that the ALJ erred in failing to allow her to amend her alleged onset date, that the ALJ failed to properly consider medical opinions of record and therefore findings at steps two and three and the RFC were not supported by substantial evidence, the ALJ's credibility determination was not supported by substantial evidence and that the ALJ's step four finding that Plaintiff can perform her past relevant work was not supported by substantial evidence.

### 1.    Whether The ALJ Properly Denied Plaintiff's Request To Reopen Prior Applications

In the current application, Plaintiff alleged an onset date of March 27, 2009. Prior to the hearing, Plaintiff requested a reopening of her prior applications to allow an alleged onset date of April 22, 2004. (Tr. 229.) In his decision, the ALJ cited Plaintiff's two prior applications for social security disability benefits. Plaintiff filed a claim on May 25, 2006, which was denied on August 28, 2006, and she filed a claim on September 12, 2008, which was denied on March 27, 2009. (Tr. 14.) The ALJ determined that Plaintiff's prior Title XVI application was not the subject of a reopening procedure and he found no good cause to reopen the prior two SSI applications. He stated that he also considered Social Security Ruling (SSR) 91-5p and the provisions do not apply in the instant case. He denied Plaintiff's request to amend and found that the issue of her inability to work was res judicata through March 27, 2009. (Tr. 15.)

7

A decision not to reopen a prior claim is not subject to judicial review "absent a colorable constitutional claim." *Wills v. Sec'y, Health and Human Servs.*, 802 F.2d 870, 873 (6th Cir. 1986) (citing *Califano v. Sanders*, 430 U.S. 99, 107-08 (1977)). "The existence of a colorable constitutional claim is a question of law for the court to decide." *Id.* In her brief Plaintiff did not plead a colorable constitutional claim. In her brief she relied on 20 C.F.R. § 404.995 to argue that new and material evidence had been submitted that was not included in the prior applications. 20 C.F.R. § 404.995 provides that "[i]f two claims for benefits are filed on the same earnings records, findings of fact made in a determination on the first claim may be revised in determining or deciding the second claim, even though the time limit for revising the findings made in the first claim has passed." 20 C.F.R. § 404.995. Plaintiff does not identify such evidence in her argument. (Doc. 10 at 19-20.)

The Regulations provide conditions for reopening a prior determination or decision for any reason within 12 months of the date of the notice of initial determination and for a finding of good cause withing four years of the date of the initial determination. *See* 20 C.F.R. § 404.988. Plaintiff's request is outside the time frames set forth in 20 C.F.R. § 404.988(a) and (b) and there is no allegation that she meets the conditions set forth in sub-part (c), relating primarily to fraud, issues related to earnings records, clerical errors and the effect of criminal convictions. *See* 20 C.F.R. § 404.988(c).   The ALJ also considered Social Security Ruling (SSR) 91-5p, "Mental Incapacity and Good Cause for Missing the Deadline to Request Review." SSR 91-5p. The ALJ correctly considered Plaintiff's request to reopen the prior claims to obtain an earlier onset date and was within his authority to deny the same. Plaintiff has presented no claim under which this Court should review his decision.

**2.      Whether the ALJ's Findings at Steps Two Through Four Were Supported By Substantial Evidence**

At step two, the ALJ found that Plaintiff's multiple sclerosis is a severe impairment, but her mood disorder, optic neuritis and sleep apnea are non-severe impairments. To evaluate the severity of a mental impairment or impairments, first, the fact finder must evaluate the symptoms, signs and laboratory findings to determine whether there is a medically determinable impairment. *See* 20 C.F.R. § 416.920a(b)(1). Next, the fact finder rates the "degree of functional limitation resulting from the impairment(s)." 20 C.F.R. § 416.920a(b)(2).

The ALJ followed the prescribed rules for evaluating Plaintiff's mental impairments. *See* 20 C.F.R. § 416.920a. The ALJ properly measured the severity of Plaintiff's mental disorder in terms of four functional areas, known as the "B" criteria, by determining the degree of limitation in each area. *See* 20 C.F.R. § 416.920a(c)(3). The ALJ determined that Plaintiff has mild limitations in activities of daily living, social functioning and maintaining concentration, persistence and pace and that there have been no episodes of decompensation. (Tr. 20.) In making these findings, the ALJ primarily considered Plaintiff's testimony and reports. (20.) The ALJ gave reasons to support the limitations set forth in each of the areas of functioning. He cited both Plaintiff's Function Report and a Function Report completed by Plaintiff's husband. (Tr. 20, 190-97, 198-205.) For example, in activities of daily living, the ALJ noted that Plaintiff is able to clean her house and wash laundry. (Tr .20.) Plaintiff reported that she performs cleaning and does laundry twice a week for about two to three hours. She reported that she needs help carrying and folding the laundry. (Tr. 192.) Despite her reports of limitations in daily activities, such limitations appear to be predominately related to her physical impairments. Similarly, her husband reported she performs simple tasks around the house after she wakes up and after her back and legs stop

hurting. (Tr. 198.) Consistent with the ALJ's finding that she provides care for her children, both Plaintiff and her husband reported that she prepares meals for the family and she parents their youngest child, who was not yet school-aged at the time of the decision. (Tr. 20, 191, 199.)

In the area of social functioning, the ALJ cited the reports that Plaintiff is able to attend church, use social media websites and interact over the telephone.  (Tr. 20, 202.) She also has a "best friend" who assists her with tasks. (Tr. 199.) In the area of concentration, persistence and pace, the ALJ cited reports that Plaintiff is able to "pay bills, count change, watch television, use the computer, drive a car, and prepare family dinners, which are all activities that require a degree of extended and sustained concentration and persistence." (Tr. 20, 190-97, 198-205.)

Plaintiff argues that her counselor completed a Mental Impairment questionnaire that "suggests that the Plaintiff may meet a listing for an Affective Disorder." (Doc. 10 at 21.) As set forth in further detail below, the Listing of Impairments describes, for each of the major body systems, impairments which are considered severe enough to prevent a person from doing any gainful activity. *See* 20 C.F.R. § 416.925. Plaintiff does not provide the counselor's name or include citation to a transcript page in this portion of her argument, nor does she specifically show how the questionnaire shows that she meets a Listing. However, in the fact section, Plaintiff referred to Terri Scott, Ph.D., and a mental impairment questionnaire. (Doc. 10 at 15.)

The ALJ addressed the records from Dr. Scott in his decision at step two, and identified Dr. Scott as a treating psychologist. (Tr. 18.) "Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources' that reflect judgments about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-3p.

The opinion of a treating physician should be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "not inconsistent with the other substantial evidence in [the] case record." *Wilson*, 378 F.3d at 544; 20 C.F.R. § 416.927(c)(2). "The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 416.927(c)(3). "Moreover, when the physician is a specialist with respect to the medical condition at issue, . . . her opinion is given more weight than that of a non-specialist." *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

"Claimants are entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight." SSR 96-2p; *see also Rogers*, 486 F.3d at 242. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

If the ALJ declines to give controlling weight to a treating source's opinion, then he must use the following factors to determine what weight the treating source opinion should be given: "the length of the treatment relationship and the frequency of examination, the nature and extent

of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Wilson*, 378 F.3d at 544. These factors may be applied to all medical opinions, not just treating sources. *See* SSR 06-3p.

Since the Commissioner is responsible for determining whether a claimant meets the statutory definition of disability, the ALJ "will not give any special significance to the source of an opinion[, including treating sources], on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section[,]" i.e., whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, residual functional capacity, and application of vocational factors. *See* 20 C.F.R. § 416.927(d)(3). A "[d]octor's notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' [Thus,] [a]n ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011). "Otherwise, the hearing would be a useless exercise." *Id.*

In addition, "a treating physician's assessment may be unreliable because of the bias he or she may bring to the disability evaluation," i.e., he or she "'may want to do a favor for a friend and client, and so the treating physician may too quickly find disability.'" *Id.* at 1073 (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001)). "Additionally, we have noted that the claimant's regular physician may not appreciate how her patient's case compares to other similar cases, and therefore that a consulting physician's opinion might have the advantages of both impartiality and expertise." *Dixon*, 270 F.3d at 1177. "[O]nce well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight . . . [but] 'is just one more piece of evidence for the administrative law judge to weigh . . . .'"

*Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (quoting *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006)).

Dr. Scott completed a Mental Impairment Questionnaire (the "Questionnaire") dated February 20, 2012. (Tr. 413-19.) The record contains Dr. Scott's treatment notes and a Psychosocial Assessment dated December 6, 2010. (Tr. 331-59, 368-412.) On the Questionnaire, Dr. Scott indicated that he has treated Plaintiff on a weekly to monthly basis from December 6, 2010 through the February 20, 2012 date of the Questionnaire. (Tr. 414.) Dr. Scott diagnosed "Major Depression, Recurrent, Panic Attacks [and] Marital Conflict." (Tr. 414.) He assigned a current GAF of 65-70 and noted that Plaintiff's highest GAF over the past year was 85-90. (*Id.*) On a check-box chart, Dr. Scott indicated several limitations that would be work-preclusive, for example, Plaintiff would have "[n]o useful ability to function" in the areas of maintaining regular attendance and being punctual "within customary, usually strict tolerances," completing "a normal workday and workweek without interruptions from psychologically based symptoms," performing "at a consistent pace without an unreasonable number and length of rest periods," and dealing "with normal work stress." (Tr. 416.) He indicated that she would be "[u]nable to meet competitive standards" in maintaining "attention for [a] two hour segment" and responding "appropriately to changes in a routine work setting." (Tr. 416.) On a list of "signs and symptoms," he checked nearly 40 percent of them. (Tr. 415.)

In addition to signs, symptoms and limitations related to Plaintiff's depression, Dr. Scott also included many references to Plaintiff's neurological condition MS, based on Plaintiff's reports. For example, in response to the question "Does the psychiatric condition exacerbate your patient's experience of pain or any other physical symptom?" Dr. Scott answered "[y]es" and reported, "Her reported MS symptoms of weakness, blindness, fatigue, forgetfulness [and] seizures

13

increase when she reports increased stress in her everyday activities [and] life." (Tr. 417.)  Dr. Scott opined that Plaintiff had marked limitations in activities of daily living, and extreme limitations in maintaining social functioning and maintaining concentration, persistence and pace. (Tr. 418.) He reported that she had "[t]hree or more episodes of decompensation within 12 months, each at least two weeks long." (Tr. 418.)

The ALJ included an extensive discussion of Dr. Scott's opinion and records and pointed out specific inconsistencies between the severity alleged in the Questionnaire and Dr. Scott's treatment notes, which did not reflect such severity. (Tr. 18-20.) For example, Dr. Scott's treatment notes show that Plaintiff initially sought treatment due to a breakdown of her marriage and depression. (Tr. 18, 349.) On a December 6, 2010 Psychosocial Assessment, Dr. Scott diagnosed Major Depression, Recurrent. (Tr. 356.) The record evidence does not show two week episodes of decompensation.

The ALJ pointed out that the Global Assessment of Functioning[4] (GAF) scores assigned by Dr. Scott throughout his treatment records and on the Questionnaire were not consistent with the "marked" and "extreme" limitations in functional areas as opined by Dr. Scott on the Questionnaire. GAF scores assigned from ranged from the 85 and 90, assigned in December 2010 and January 2011, to a 65-70 noted on the Questionnaire. (Tr. 381-82, 414.)

GAF scores are not dispositive and the ALJ also relied on Dr. Scott's records from meeting and treating Plaintiff, which did not support the severity of functioning set forth in the

---

[4]GAF is a clinician's subjective rating, on a scale of zero to 100, of an individual's overall psychological functioning. At the low end, GAF 1-10 indicates '[p]ersistent danger of severely hurting self or others (e.g., recurrent violence) or persistent inability to maintain minimal personal hygiene or serious suicidal act with clear expectation of death.' *DSM-IV-TR* at 34 (boldface and capitalization omitted). At the high end, GAF 91-100 indicates '[s]uperior functioning in a wide range of activities, life's problems never seem to get out of hand, is sought out by others because of his or her many positive qualities. No symptoms.' *Id.* (boldface omitted). *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 503 n.7 (6th Cir. 2006).

questionnaire. (Tr. 19-20.) The majority of the treatment notes are, as the ALJ found, focused on Plaintiff's relationship and interactions with her husband and family members. The severity of signs and symptoms alleged in the Questionnaire is not noted in the treatment records, with the exception of the April 25, 2011 Counseling Session Progress Note. In the comment section of that Note, it is reported that Plaintiff sometimes forgets parts of movies and conversations and "zones out," that she is not aware of these incidents and family members inform her, and that her best friends "stays with her during the day." (Tr. 392.) These symptoms appear to be based on Plaintiff's report, because the note otherwise reports that she was asking for her release of documents for the Social Security Administration, and it contains Plaintiff's report of her work history and problems that prevent her from working, and not the doctor's observations. (Tr. 392.) At that appointment and the following appointment, it was noted she was having panic attacks, crying and depression. (Tr. 392-93.) By the May 17, 2011 appointment, Plaintiff was having less family conflict. (Tr. 394.) By May 31, 2011, she was in an improved mood, having "not many panic attacks except [with her] family," had more energy and was sleeping better. (Tr. 395.) By June 2011, Plaintiff was reported to have increased anxiety with too many activities in one day, for example, with softball and the kids the prior Friday. She was also reported to be involved in softball until August, was reading, and was planning to camp for four days over the fourth of July. (Tr. 396.) In July 2011 she reported that softball was over, she had less activity and the camping trip had been great. (Tr. 398.) She had more energy and less overall stress. (*Id.*) Through August and September her anxiety and aggressive feelings were noted to increase with family conflict and concerns about her mother's health. (Tr. 405.) In October 2011 she had concerns about her high school credits not transferring and she was taking an English class. (Tr. 406.) In November 2011, she was still reporting marital issues, but had been able to help a friend move with her truck, caring

for her friend's children while the friend moved. (Tr. 408.) She continued to report trouble sleeping. (Tr. 406-410.) The treatment records also show she socialized, having friends over on the weekend. (Tr. 409.) In January 2010, Plaintiff reported having daily panic attacks and was worried about school. (Tr. 412.)

Dr. Scott reported on the Questionnaire that "[r]egular attendance could not be maintained as she often is tardy or forgets sessions," yet the record does not show documentation of missed appointments, despite a code for the same at the top of the treatment note forms. (Tr. 416, 381-412.) The ALJ gave good reasons for discounting Dr. Scott's Questionnaire and instead, considered the doctor's treatment notes, which support the kind of involvement in the home and with her family and others, on which the ALJ relied for the "B" criteria findings regarding Plaintiff's mental impairment.

Plaintiff argues that there are consultative medical evaluators' opinions in the record which the ALJ did not consider. (Doc. 10 at 28.) State agency medical consultative evaluator Ron Marshall, Ph.D., completed a Psychiatric Review Technique dated June 23, 2011, in which he diagnosed an affective disorder and opined that Plaintiff has mild restriction in activities of daily living, moderate difficulties in both maintaining social functioning and maintaining concentration, persistence and pace, and has had no repeated episodes of decompensation. (Tr. 78-79.) There is no evidence in the record that the ALJ considered Dr. Marshall's opinion. The opinion conflicts with the ALJ's mild findings in the functional areas. The ALJ's determination of the "B" criteria and his finding that Plaintiff's affective disorder is non-severe is not supported by substantial evidence where he has not resolved the conflict with Dr. Marshall's opinion.

Plaintiff also argues that her optic neuritis is a severe impairment and did not resolve within one year, as the ALJ found. In April 2010, Plaintiff reported to the emergency department with

complaints of vision loss in the right eye. (Tr. 319-20.) As Defendant and the ALJ pointed out, the diagnosis of optic neuritis in April 2010 was "questionable" and Plaintiff was to be referred to a neurologist for follow-up care. (Tr. 319-20.) Plaintiff was then diagnosed with optic neuritis, followed up through April 2010, was treated with prednisone, and improvement was noted within a month. (Tr. 274-82.) In treatment notes from May 18, 2010, the optic neuritis was reported as "resolved." (Tr. 283.)

May 2011 notes from Iftikhar Khan, M.D., show that it had been six months since he had treated Plaintiff and the doctor noted that, pursuant to Plaintiff's report, she had in the interim "a problem with her right eye vision with partial recovery and she received Prednisone through her ophthalmologist's office. She reported blurring of the right vision and some visual field deficits." (Tr. 476.) This appears to be based on Plaintiff's report and there was no evidence of further ophthalmological treatment or testing that resulted in a current diagnosis of optic neuritis. (Tr. 476, 366-67.)  On August 11, 2011, Dr. Khan noted Plaintiff's report that she had poor vision, especially at night, with exposure to bright light, or with opposing vehicle headlights, but he reported that "[t]here has not been any other complaint of diplopia or any other progressive visual loss or new optic neuritis problem." (Tr. 477.) On September 9, 2011, Plaintiff complained of flashes of light and "floaters" in the right eye. (Tr. 366-67.)  Dr. Jeffrey Robinson noted a history of optic neuritis, but did not note that it had recurred. (Tr. 366-67.) The ALJ cited substantial evidence in the record to support his finding that this impairment did not last the requisite twelve months and was resolved. (Tr. 17, 283, 476.)

Plaintiff also alleges that her sleep apnea is a severe impairment. As Defendant correctly points out, Plaintiff has cited no medical evidence or legal authority in support of her claim that her sleep apnea was severe. "[I]ssues adverted to in a perfunctory manner, unaccompanied by

some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to ... put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (citations omitted); *see also Crocker v. Comm'r of Soc. Sec.*, 2010 WL 882831 at *6 (W.D.Mich. 2010)("This court need not make the lawyer's case by scouring the party's various submissions to piece together appropriate arguments.")(citations omitted). I suggest that this claim is waived.

Case law holds that even if substantial evidence supports a finding that Plaintiff's sleep apnea and optic neuritis were severe, it is not reversible error where the ALJ has found that the impairments were non-severe yet is required to consider both severe and non-severe impairments through steps three through five of his analysis. *See McGlothin v. Comm'r of Soc. Sec.*, 299 Fed.Appx. 516, 522 (6th Cir. 2008)("[O]nce any impairment is found to be severe, the ALJ must consider both severe and nonsevere impairments in the subsequent steps. . . . It then became 'legally irrelevant' that her other impairments were determined to be not severe."). However, in the context of Plaintiff's affective disorder, there is a medical opinion of record that was neither considered nor explained by the ALJ and the medical opinion supports not only a finding of a severe affective disorder, but associated limitations that may be inconsistent with both the ALJ's RFC and his step four finding that Plaintiff may perform her past relevant work.  For this reason, the ALJ's finding that Plaintiff's affective disorder was non-severe is not supported by substantial evidence.

Plaintiff argues that the ALJ failed to properly apply step three of the sequential evaluation. Plaintiff argues that the ALJ erred in making a conclusory finding that her multiple sclerosis did not meet or medically equal a Listing. (Doc. 10 at 22.)  Plaintiff relied on Dr. Khan's opinion to support her argument that she meets the listing for multiple sclerosis. (Tr. 471.)

18

Plaintiff's argument focuses on the "Listing of Impairments," 20 C.F.R. § 404, Subpt. P, Appendix 1. In order to establish disability under the Listings, each requirement of the applicable Listing must be met. *See* 20 C.F.R. § 416.925(d) ("Your impairment(s) cannot meet the criteria of a listing based only on a diagnosis. To meet the requirements of a listing, you must have a medically determinable impairment(s) that satisfies all of the criteria in the listing."); *see also Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify." Emphasis in original.). Where a claimant successfully carries this burden, the Secretary will find the claimant disabled without considering the claimant's age, education and work experience. *See* 20 C.F.R. § 416.920(d).

The ALJ considered Plaintiff's multiple sclerosis pursuant to Listing 11.09. Listing 11.00 deals with neurological impairments and Listing 11.09 specifically provides the "major criteria for evaluating impairment caused by multiple sclerosis." 20 C.F.R. Pt. 404, Subpt. P, App. 1, 11.00E. Listing 11.09 for multiple sclerosis requires

> A. Disorganization of motor function as described in 11.04B; or
>
> B. Visual or mental impairment as described under the criteria in 2.02, 2.03, 2.04, or 12.02; or
>
> C. Significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity, demonstrated on physical examination, resulting from neurological dysfunction in areas of the central nervous system known to be pathologically involved by the multiple sclerosis process. *Id.* at 11.09.

Listing 11.04B requires "[S]ignificant and persistent disorganization of motor function in two extremities, resulting in sustained disturbance of gross and dexterous movements, or gait and station (see 11.00C)." *Id.* at 11.04B.

The ALJ concluded that Plaintiff does not meet Listing 11.09 for the following reasons:

19

> [S]he does not have the mandated Listing symptomology, disorganization of motor function, visual or mental impairment as described under sections related to senses or mental impairment. She does not have significant, reproducible fatigue of motor function with substantial muscle weakness on repetitive activity. (Tr. 21.)

The ALJ's discussion in that portion of the decision included findings of fact and conclusions of law, yet did not cite specific evidence of record. (Tr. 21.) The ALJ's decision may be read as a whole for the review and analysis of the evidence of record that is relevant to the determination that Plaintiff's multiple sclerosis did not meet a listing. *See Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004)("In this case, the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that [claimant] did not meet the requirements for any listing, including Listing 3.02(A)."). It "would be a needless formality to have the ALJ repeat substantially similar factual analyses at both steps three and five," therefore the Court considers the ALJ's decision in whole for explanation of his step three determination. *See Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004).

Plaintiff argues that a Multiple Sclerosis Medical Source Statement form completed by Dr. Khan shows she meets the Listing criteria for multiple sclerosis because he answered yes to the question "Does your patient have significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movement or gait and station?" (Doc. 10 at 22, 471-74.) He was next asked to "describe the degree of interference with locomotion and/or interference with the use of fingers, hands and arms." (Tr. 471.) He wrote in response "Ataxia." (*Id.*) The Listings, however, describe criteria for disorganization of motor function as follows:

> Persistent disorganization of motor function in the form of paresis or paralysis, tremor or other involuntary movements, ataxia and sensory disturbances (any or all of which may be due to cerebral, cerebellar, brain stem, spinal cord, or peripheral nerve dysfunction) which occur singly or in various combinations, frequently provides the

20

sole or partial basis for decision in cases of neurological impairment. The assessment of impairment depends on the degree of interference with locomotion and/or interference with the use of fingers, hands, and arms. 20 C.F.R. 404, Subpt. P, App. 1, 11.00C.

Dr. Khan's opinion does not give any details about the disorganization of motor function and fails to identify which of the two extremities are affected. In a discussion of the record, and Dr. Khan's opinion specifically, the ALJ cited findings that contradict the allegation of disorganization of motor function that results in "sustained disturbance of gross and dexterous movement or gait and station." At an emergency department visit on October 12, 2010 for complaints of dizziness and weakness, it was noted that Plaintiff neurologic motor function was normal. (Tr. 290.) On December 6, 2010, Plaintiff reported to Dr. Scott that she had no physical limitations or problems walking and no difficulty taking care of herself. (Tr. 23, 349.) In Function Reports, neither Plaintiff nor her husband indicated that she needed a ambulatory aid or had problems with using her hands. (Tr. 195, 196, 203, 204.)

On May 12, 2011 Dr. Khan reported that he had not seen Plaintiff in six months. (Tr. 23, 323.) She had not been taking any "immune myelinating therapy," and he noted that there was "not any other discrete neurologic deficit, but overall she tells me she has some intermittent numbness and progressive ataxia with generalized worsening of symptoms, fatigue and so on." (Tr. 323.) Plaintiff reported a three-day episode of dizziness with tinnitus and the doctor reported that there "has not been an trigeminal neuralgia problem." (*Id.*) A May 2011 MRI revealed "[m]oderate white matter changes with associated diffuse abnormal signal to the corpus callosum," "findings are consistent with known history of multiple sclerosis" and a "small area of abnormal enhancement within the right parietal lobe in keeping with active demyelination." (Tr. 326.) The record shows that Plaintiff had been treated with Rebif in the past until she was unable to afford

the co-pay. (Tr. 324.) At the May 2011 appointment, Dr. Khan prescribed Copaxone. (Tr. 323.) Plaintiff tolerated the Copaxone well, with the doctor noting that there "has not been any new attack since she has been on Copaxone." (Tr. 477.)

In December 2011, Dr. Khan noted that Plaintiff "has not had any new motor sensory deficit problems." (Tr. 478.) In contrast, at the February 2012 appointment, Dr. Khan noted that Plaintiff "reports a variety of complaints . . ." or "a whole lot of complaints" and that it was "very difficult to know if she has any clear flare-up" because he was not getting "any history." (Tr. 479.) The doctor described her symptoms as "overall rather non specific." (*Id.*)

The objective medical evidence of record does not show that Plaintiff met criteria for persistent disorganization of motor function pursuant to Listing 11.09 for multiple sclerosis. The ALJ's findings at step three with respect to Plaintiff's multiple sclerosis are supported by substantial evidence.

Plaintiff also argues that her mood disorder may also have met the Listing for affective disorders. The opinion on which Plaintiff relies was the Mental Impairment Questionnaire completed by Dr. Scott. (Tr. 413-19.) As set forth above, the ALJ properly explained why the Questionnaire was given little weight. Plaintiff identifies no other medical evidence of record that supports the factors required by Listing 12.04, Affective Disorders. In light of the remand for consideration of Dr. Marshall's opinion and a new step two determination with respect to Plaintiff's affective disorder, if the ALJ determines that Plaintiff's affective disorder was a severe impairment then he should also consider her affective disorder at step three.

Plaintiff argues that the ALJ failed to discuss Dr. Khan's Multiple Sclerosis Medical Source Statement, which contradicts the ALJ's RFC. (Doc. 10 at 26.) As set forth above with respect to the Regulations for considering medical opinions, Plaintiff concedes that "[w]hile a doctor's

conclusion that a patient is disabled from all work cannot be entitled to controlling weight, it still may be considered." (Doc. 10 at 27, citing SSR 96-5p.) Plaintiff argues that the ALJ's reason for not giving controlling weight to Dr. Khan's opinion is not supported by the record.

Dr. Khan opined that Plaintiff would "need to take unscheduled breaks during a working day" approximately three to four times per year for two to four days each time. (Tr. 472.) Dr. Khan did not complete the physical residual functional capacity portion of the form and instead noted that for such an evaluation, Plaintiff should be sent to an occupational medicine assessment. (Tr. 473-73.) The ALJ identified Dr. Khan as a treating physician, yet found that Dr. Khan's opinion was "not supported by any treatment records, clinical signs, or objective findings anywhere in the record." (Tr. 24.) As set forth above with respect to the step three determination, the ALJ gave good reasons citing contradictory evidence in the record for giving little weight to Dr. Khan's opinion in the Multiple Sclerosis Medical Source Statement. (Tr. 23-24.) The ALJ cited records where Plaintiff reported that she had no "physical limitations or problems walking" and she indicated no problems using her hands. (Tr. 24, 349.) Despite complaints of dizziness and fatigue, her symptoms were non-specific. (Tr. 24, 476-79.)

More importantly, Plaintiff points out that the record contains two state agency consultative evaluator medical opinions that were not addressed in the ALJ's decision. There is no evidence that the ALJ considered these two opinions, which both contradict his RFC. Social Security Ruling 96-6p specifically requires administrative law judges to consider state agency medical and psychological consultants' "findings of fact about the nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists." SSR 96-6p.

In addition to Dr. Marshall's opinion, discussed above, Jean Kozachik, M.D., completed a physical residual functional capacity assessment dated June 20, 2011. (Tr. 80-82.) Dr. Kozachik

23

opined that Plaintiff could lift and carry, push and pull, up to 20 pounds occasionally and 10 pounds frequently, and stand and/or walk 6 hours of an 8-hour workday. (Tr. 80.) This is consistent with the ALJ's finding that Plaintiff can perform light exertion work. However, Dr. Kozachik included postural and environmental limitations, most notably the need to avoid all exposure to hazards, including machinery. (Tr. 81.) At step four the ALJ found that Plaintiff could perform past work as a press operator. (Tr. 25.) On its face, this finding is directly contradicted by Dr. Kozachik's opinion; Plaintiff testified that her press operator job involved the operation of machinery. I therefore suggest that the ALJ's RFC is not supported by substantial evidence where he has not addressed this contradictory medical opinion and evidence.

Plaintiff also raises issues as to whether the ALJ's credibility determination was supported by substantial evidence and whether the ALJ's findings at step four are supported by substantial evidence where it is arguably unclear whether the ALJ found Plaintiff can perform her past work as she actually performed it, or as it is performed in the economy.

The ALJ is required by the Regulations to explain his credibility determination with respect to Plaintiff's symptoms. *See* 20 C.F.R. § 416.929; *see also* SSR 96-4p and 96-7p. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witnesses's demeanor and credibility." *Walters,* 127 F.3d at 531. Credibility assessments are not insulated from judicial review. Despite deference due, such a determination must nevertheless be supported by substantial evidence and contain specific reasons for the weight the adjudicator assigned to the individual's statements. *See id.*; SSR 96-7p.

The ALJ's credibility determination was based, at least in part, on "minimal objective or clinical findings to demonstrate a disabling degree of severity caused by [Plaintiff's] multiple

24

sclerosis" and that "[t]reatment records show that [Plaintiff] is mostly asymptomatic and that the etiology of her alleged symptoms remained 'undetermined.'" (Tr. 23.) The ALJ appears not to have considered either Dr. Kozachik's or Dr. Marshall's medical opinions which were based on their own reviews of the record. I suggest that in this circumstance the credibility determination is not based on substantial evidence where these two additional medical opinions were not addressed in the ALJ's decision.

Regarding step four of the analysis, the Commissioner's regulations state that the agency "will first compare our assessment of your residual functional capacity with the physical and mental demands of your past relevant work." 20 C.F.R. § 416.960(b).  20 C.F.R. § 416.920(f) provides

> Your impairment(s) must prevent you from doing your past relevant work. If we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our residual functional capacity assessment, which we made under paragraph (e) of this section, with the physical and mental demands of your past relevant work. See paragraph (h) of this section and § 404.1560(b) [and § 416.960(b)]. If you can still do this kind of work, we will find that you are not disabled. 20 C.F.R. § 416.920(f).

"'By referring to the claimant's ability to perform a "kind" of work, [the regulations] concentrate[] on the claimant's capacity to perform a type of activity rather than his ability to return to a specific job or to find one exactly like it.'" *Boucher v. Apfel*, No. 99-1906, 2000 WL 1769520, at *7 (6th Cir. Nov. 15, 2000) (quoting *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995)).

Past relevant work is defined as work that "was done within the last 15 years, lasted long enough for you to learn to do it, and was substantial gainful activity." 20 C.F.R. § 416.965(a). In making a determination that Plaintiff can perform his past relevant work, the ALJ may rely on "either the specific job a claimant performed or the same kind of work as it is customarily

25

performed throughout the economy." SSR 82-62; *see also* SSR 82-61. The requirements of Plaintiff's past work as performed are critical where the ALJ has concluded that Plaintiff is not disabled at step four because Plaintiff can perform this work as she performed it in the past. *See Whitfield v. Comm'r of Soc. Sec.*, 2014 WL 1329362, at *8 (W.D. Mich. March 28, 2014).

At step four the ALJ determined the following: "In comparing [Plaintiff's] residual functional capacity with the exertional demands of her past relevant work as a press operator, I find that [Plaintiff] is able to perform this work as [Plaintiff] performed the job in the national economy."[5] (Tr. 25.)  There is no challenge to the classification of Plaintiff's work as a press operator as "past relevant work." Plaintiff instead challenges the ALJ's development and explanation of the finding that she can still perform that work. It is unclear whether the ALJ made a finding that Plaintiff can perform her past work as she actually performed it, or as it is generally performed in the national economy. On remand, the ALJ should clarify his step four findings.

For these reasons, I suggest that the ALJ's determination is not supported by substantial evidence. This case should be remanded for consideration of the consultative evaluators' June 2011 opinions, a new determination made at step two, and if necessary, step three regarding Plaintiff's affective disorder, a new credibility and RFC determinations, and continue to steps four and five[5] as necessary and set forth herein.

**G.    Conclusion**

---

[5]The ALJ also made an alternate step five determination, which should be reconsidered on remand as necessary.

The ALJ's decision to deny benefits at step four, or, in the alternative, step five, was not supported by substantial evidence and should be remanded for the reasons set forth herein. Plaintiff's Motion for Summary Judgment (doc. 10) should be granted, that of Defendant (doc. 11) denied and the decision reversed and remanded for further action as set forth herein.

## III.   **REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985);  *Howard v. Sec'y of Health & Human Servs.,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Soc. Sec.,* 474 F.3d 830, 837 (6th Cir. 2006) (*citing Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987)). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  E.D. Mich. LR 72.1(d)(3). The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

s/ Charles E Binder
CHARLES E. BINDER
Dated: November 13, 2014                United States Magistrate Judge